I'm going to aspire to save five minutes for oral argument, but the district court in this case predicated its issuance of the preliminary injunction entirely on its conclusion that the assessments in the case likely violated the First Amendment. That conclusion is wrong, and before I address them, I think I want to point out that the other preliminary injunction factors in this case do not remotely justify the extraordinary interim order the court entered into this case. An order that disrupts rather than maintains the status quo, an order that impairs a successful and important state program, an order that ironically reduces the amount of speech that is disseminated to the public, and that threatens to unleash the very free rider problem that caused the legislature to create the commission in the first place. Now, as to the merits, I want to point out, draw the Court's attention to something that occurred in the district court after the court entered the preliminary injunction. The district court has entered an order earlier this year staying all proceedings on these claims, awaiting what the court called guidance from the Ninth Circuit. And for that, the court did so because, and I'm quoting from page 13 of the March 21st order, staying further proceedings. The court said, quote, given the unsettled nature of the law, the court cannot agree with Paramount's assertion that, quote, the Ninth Circuit is almost certain to approve this court's preliminary injunction ruling. And indeed, on the merits, we submit that the district court erred as a matter of law first on two threshold issues that remove the commission's speech activities from First Amendment scrutiny at all. And then, after the court found that the First Amendment was implicated in this case, in declining to engage in any balancing of the interests at stake. Therefore, the preliminary injunction should be reversed for three independent reasons. First, the speech in question qualifies as the government's speech, not private speech. Because the California legislature has both defined the message that the commission is to deliver and has made the commission, quote, and I'm quoting from the Supreme Court's decision in Johans, fully answerable to a politically accountable official for its delivery of that message. Because the statute, the Pistachio Act, grants the Secretary of Food and Agriculture plenary authority to order the commission to correct or cease any speech that he or she believes is not consistent with the public interest. And the statute also requires that the commission's planned activities, all of its promotional activities, be reviewed and approved in advance by the Secretary of Food and Agriculture. A statutory requirement that did not exist with respect to the beef board in Johans. The district court's ruling that the CDFA must specifically approve the actual ads, as opposed to the message that the ads will deliver, trivializes the constitutional test. But didn't the Supreme Court actually say that, that that was one of the justifications for finding that it was in fact government speech, that virtually every word was reviewed by the government? Yes. In Johans, the Supreme Court found, although it said that this was more than adequate in order to establish that the speech was the government's speech, the Supreme Court in Johans used the fact that some employee of the Secretary of Agriculture was reviewing the words in order to demonstrate that the Secretary wasn't exercising, quote, effective control. What the Supreme Court said in Johans was that, quote, the message of the promotional campaigns is effectively controlled by the government. And before it got to the review, word-by-word review, it said what that means is that the government has, quote, set out the overarching message and some of its elements, and left the development of the remaining details to an entity whose members are answerable to the Secretary. And then it said, in addition, and it goes on to talk about the review. Now, in that case, there was no statutory or regulatory requirement that the Secretary or the Secretary's delegate actually review the ad copy. What the statute, the statute didn't have any requirement about that at all. The regulations that govern the Beef Board required only that the board, quote, submit to the Secretary for approval any plans or projects. Here, there is a statutory requirement that before the commission can engage in any of the challenged activities, the Secretary of Food and Agriculture must in advance concur in the statutory, quote, statement of proposed activities. That's correct, and it also, the legislation also authorizes the Secretary of Agriculture to review each individual advertising piece. But the difference between this case and Johan's seems to me is the difference between authorizing the review of the message and actually exercising that authorization to really be reviewing the message so that it is, in fact, the government who is actually talking, not a bunch of private companies. The test is whether looking at the statutory scheme for a facial challenge, and presumably how it's applied in an as applied challenge, whether the legislature has set out the overarching message and there's no dispute about that, and whether in the Supreme Court's words, effective control over that message is satisfied because the details of the message are by somebody who is answerable to a politically accountable official. And the test that we are proposing, not proposing, we think what the Supreme Court meant in Johan's was you, to determine whether the speech is private or the speech is governmental. You look at the statutory scheme, you look at the regulations that implement that scheme, and you determine whether or not this is an instance in which, to quote Velesquez, the government has used private speakers to transmit specific information pertaining to its own programs. Now, Paramount disavows any claim that what is required is a review of the actual ads in order to satisfy the requisite degree of control. But it doesn't explain what the test would be if it is something other than looking at what the legislature has said is the message and looking at the degree of control that the legislature requires that a politically accountable official engage in. And I think that as I interpreted Paramount's argument, it would be that even if it were to accept your premise as to the statutory structure, that you don't have effective control because of the execution of the statute and how it has carried out in practice. So my question is, one, do you think that's a distinction that is supported by the law? And if it were supported by the law, is it supported by the record? It is neither supported by the law nor by the record. The question, none of the other, Johans is unique. I've always called it Johans, but now I've been told that that's not the man's name. With all due respect. The question is, if you look at all of the Supreme Court's government speech cases, both holdings and cases in which they've talked about or characterized the speech as government speech, for example, Rust and Velasquez and Southworth, there is no attention paid to whether or not the politically accountable official is, in fact, acquitting his or her official responsibilities, that is, doing what the law requires be done in order to establish effective control. If the answer is no, that's why political speech is subject to controls of democratic accountability. If the Secretary of Food and Agriculture should be doing more, or if ads are coming out that are inconsistent with the message, or that members of the public think are not consistent with the public interest, political pressure can be brought to bear on the Secretary. What's particularly interesting in this case is there is no, there's no question that the Secretary approved in writing the very mess, the very aspects of the message that Paramount complains about, and I'll explain that in a minute. Can I just add something that follows up on that? On the record, we do have the approval of the commission's advertising plan, and then we see how it's played out in all of these various advertisements with Jane Seymour and documents that are being used in various magazines. Is there anybody at the Department of Agriculture who's actually even looking to see if the advertisements comport with the plan? Well, I mean, this is a case that's come up on a preliminary injunction, and we don't think that it would be relevant to the test whether somebody was or was not actually following up. But what the record shows, Judge Mortlaw. I think it might be relevant because on the accountability aspect of this and the effective control prong of the Johans case. Let me tell you what the record shows about this, but before I do so, because I know I'll forget this, let's just point out that if the secretary is required to effectively oversee this program and doesn't because he or she is only reviewing every other ad or going to every other meeting or reviewing, you know, the ads that are run domestically but not the ones that are run, you know, in Europe, first of all, the Constitution cannot, you know, cannot rest on the management style of a government official. There either is or is not a system in place in which the person who is the private interest that is directed to deliver the governance message is, quote, answerable. And that exists in this case. But we do have more, Judge Mortlaw. If the court has in front of it either the excerpts of record or our reply brief. Our reply brief on page 12, and it's on page 243 of the excerpts of record. This is just one example. But I've quoted here a passage that is in the document that the secretary actually signs before anything can move forward. It's the indented paragraph on our page 12. Here's what the secretary was told. This is after the proposed marketing plan, after the marketing committee, after the commission. This is what the secretary has to approve in order for it to go forward. He's told, quote, with the continuing emphasis on women and heart disease awareness and how California pistachios can be an important part of a heart healthy diet, this year's advertising campaign will feature three generations of Jane Seymour's family, her mother, daughter, and herself, clearly making the connection that heart disease is not a discriminator of age and that California pistachios can be an important part of lifetime heart health. Now, in this case, Paramount has articulated two objections to the speech of the commission. One, that it promotes generic rather than brand name pistachios. And two, that it has emphasis on Jane Seymour and not enough on the nuts themselves. Both of those points are articulated very clearly and very straightforwardly in the passage I just read you, and the secretary approved it. And the secretary sends a representative to the commission meetings, including the commission meeting in which this plan is distilled from the proposed plan that the secretary receives in the spring, to the marketing committee meeting where adjustments are made, and gets a copy of the annual report, Judge Wardlaw, that has certainly all of the representative ads that are made. And what's significant in terms of finding fault with, in practice, what the secretary is not doing, Paramount has not once, not even once, exercised its right under the statute to go to the secretary and either file a grievance or a complaint or a letter and say, the commission is running ads that are not consistent with the message that the State of California has charged the commission with delivering. There's been no complaint whatsoever that the ads that we're running are not, in fact, consistent with and advancing the legislature's articulated message. And, in fact, as I said, even now in litigation, the only two objections to the message that were addressed were specifically approved by the politically accountable official in this case. And, therefore, since Paramount is saying, well, the secretary, we're not saying the secretary has to actually review the relevant words. And what we're saying is you look, you determine whether or not the speech is the government by whether looking at the statute and whether it specifies the message and includes controls. The question for Paramount is, what on earth is the test if this paragraph that I just read is not enough? And does it make sense to have a test that is going to embroil this Court, just taking California and the district courts here, in years and years of fact-based litigation over whether the degree of control is or isn't enough, and how often does the secretary's representative do this, that, or the other thing, and whether something goes in and out of becoming government speech or private speech because of what an employee of a politically accountable official does or doesn't do in exercising his or her statutory oversight responsibility? If you move beyond the advertising promotional portion of the speech, there's also a complaint about the lobbyist. And it's hard for me to understand if it's a complaint that he does his job at all or how he does his job. In other words, is it substantive disagreement like the ad copy, or is it just that he exists to lobby on behalf of international trade barriers and things like that? My question is whether that form of speech and political activity is analyzed, should be analyzed and severed out from the promotional activity and looked at separately. Well, I think it should be looked at separately because it's a different activity. But it seems to me that, if anything, the case is stronger for two reasons. One, they have not — the Supreme Court made clear in Glickman and earlier in Ellis v. the Railway Employees that a complaint about lack of effectiveness in speech does not state a First Amendment objection. But that, even to this day, even in this Court, that is the only objection that Paramount has made to the employee, to the agents of the commission who represent it before the International Trade Commission. In other words, they're complaining that they don't think he's doing a good enough job, not that he's doing the job of lobbying or representing the commission in general. Is that right? That's right. Okay. They could have no possible objection to the fact that he's doing the job, because if the Court — we've reprinted the relevant copies of the Food and Agriculture Code in our — in the appendix to our blue brief. But with respect to — first, on page SA2, at the very top, with respect to commissions and councils generally, the very top of page SA2, one of the missions of the commissions is to B, elimination of tariff and non-tariff trade barriers, and then passing down to H, participation with state and federal agencies in negotiating with other governments relating to market access issues. And then if the Court will skip to page SA11, these are the functions of the Pistachio Commission itself. Section — Food and Ag Code section 69051K, which is a third of the way down the page on SA11. One of the specific directions to the commission is to, quote, present facts to and negotiate with state, federal, and foreign agencies on matters that affect the marketing of pistachios. So the commission is doing what it is not only authorized, but required to do. It is — the argument that it is ineffective in doing so is completely belied by the record, because they have successfully obtained and defended import tariffs against Iranian pistachios for 17 reviews of the Department of Commerce and the International Trade Commission. And in any event, it isn't a First Amendment objection to complain about the supposed ineffectiveness of the commission's advocates. I just — you know, if — I'm still — I'm not puzzling, but I'm still focused on Judge Wardlaw's question about actual control here. If the test really were — if the Constitution really did depend on management style, what would — let's leave the ads aside — what would these representatives in Washington have to do in order to be government speakers? They can't keep calling back to the secretary and saying, well, the Trade Commission is asking this now. Can I say that? What about the marketing representatives, which the commission used to employ before this preliminary injunction went into effect, that went to supermarkets and wholesalers and advocated for more shelf space for pistachios? The commission's required to do that by the statute. They can't keep calling up somebody in the Department of Commerce or the Department of Food and Agriculture and say, well, can I say this or can I say that? It's — the facet of this being government speech is that so long as they are speaking consistent with the message that the California legislature has directed them to deliver, and so long as the — there is a politically accountable official who has the power to ensure that they do that, the fact that they haven't conducted these types of audits, or as many as Paramount thinks they should, is just like saying that — you know, is basically saying, you know, the police are not doing a good enough job monitoring Seth Waxman because he's never been arrested or he's never been prosecuted. I mean, I would like to say in my own defense that that reflects that I'm generally a law-abiding citizen. But the — I just think that whatever test it is for oversight that Paramount is advocating here, we know it's not word by word, and they say it has to be something more than the statute, has, A, not been articulated, and, B, is going to launch Federal courts into years-long litigation over whether the speech is or isn't effectively the speech of the court. The secretary, in this case, not only has to review and approve in advance the statement of proposed activities, but has this extraordinary correct or desist order, correct or cease order, where the secretary can direct the commission to correct or cease anything that the secretary determines is not in the public interest. No explanation at all. If the commission declines to do so, the secretary has yet another authority that the Beef Board, that the Secretary of Agriculture didn't have in the Beef Board case, which is the Secretary of Food and Agriculture can totally suspend any or all activities of the commission, which the legislature has said will thereafter be without legal effect. Those are necessary and sufficient to show effective control in this case. Let me ask, we have some tension among the justices as to how one characterizes an arrangement of this nature. Is it, in your view, of any effect in our analysis that at least two of the justices view it as not under the government's speech rubric, but rather economic regulation? Well, if it is, there were dissenting justices in Johans that said this is not the speech of the government, and I think principally what was, you know, what Justice Souter's dissenting opinion is, number one, there is insufficient attribute. People who see these ads don't know that this is the government. I mean, he is speaking for, I think, one or two other justices, the Supreme Court has held that there was sufficient attribution, and here there's been no complaint about, there's no attribution issue in this case. Justice Souter's dissent also said, look, I mean, it's no wonder that the Secretary is reviewing each of these ads, but how can this be government speech when the Food and Drug Administration and the Department of, I can't remember which department it is, is actually sponsoring public programs telling people to eat less beef, and therefore I, Justice Souter, am perplexed as to how this could be considered the speech of the government. Now, the majority holding quite clearly is that it is, and we think that this case is not only consistent with Johans, but this case is much stronger. The controls are more effective than in Johans. But even if we're wrong, Judge McEwen, there is another threshold issue before you even get to the First Amendment analysis, and that's whether this is a collectivized industry for which this speech is ancillary or germane. In other words, whether it satisfies Glickman. In Glickman, the Supreme Court said, because the industry has already chosen to collectivize itself for economic reasons in significant ways, and because the speech, the assessments for speech, furthers the same general goals of collectivization, there is no independent First Amendment test that's placed on that speech. And we think the same is true here, and I, the only point of difference I think we have with Judge Morrow is the genuinely open question over whether in determining the degree of collectivization, you can look at authorities that are derived both from federal and state law. We think that since Glickman and Wildman Brothers clearly requires that you look from at the entire regulatory scheme, as this Court said, in gallow land, and because this industry had these very same pistachio-oil-oil-oil-oil-oil-oil-oil-oil-oil-oil, growers and handlers have chosen to collectivize both under the AMAA marketing order and under the California Pistachio Act, that it's irrelevant whether they chose to collectivize themselves under two statutes rather than one or under two. All right. I think we have that point in mind for the briefing, and we'll now hear from the pistachio growers. Thank you. Good morning. Rex Heineke. I think it's still morning. Rex Heineke on behalf of the plaintiffs. Let me start where the CCP started, and that is with the plaintiffs. I'm sorry. Are we splitting your time and argument? No, Your Honor. All right. Okay. It was just unclear from the list. And just to let you know, we'll give you some extra time, because we went over, and there may well be some questions for you as well. I suspect, Your Honor. Thank you so much. Certainly, Your Honor. Let me start with Johans or Johans or whatever it's called. The CCP's position boils down, I think, to something like this. They say, well, the government set the overall message there, and they claim that the beef board was answerable to a politically accountable official, which it certainly was. And they say, that's all we need here. We submit that neither of those conditions exist here. First, it is true that the government sets an overall message here. But the Supreme Court in Johans did not say that that was sufficient. What the Supreme Court went on to say, in unequivocal words, was that the Secretary or his or her representatives controlled every word, every single word, which the Court emphasized more than once. Well, the question I have is, they said that because that was the fact of the case. So, obviously, they're setting out the facts. But is that a necessary condition to what the Court terms, you know, whether the message was effectively controlled? So it would help me to see why you think... that you have to jump over in order to meet the Johans-Johans result. Well, Your Honor, first, I think it's because the Supreme Court emphasized it so much. If they didn't think it was important, why did they say it repeatedly? Maybe they would have said it once, because it was certainly a fact, but they said it repeatedly. In fact, my recollection is they italicized the word every when they spoke about every word. But it is true, and I had a variation of one of those cases in front of me, which we stayed pending Johans. It is true that it happened to be with the beef industry that the government did examine every word before it went out. And therefore, you could say that the government was truly speaking. But the Court put out a more general standard. It said effective control. So the real question is, is how much less than that is also effective control? And here we've got the approval of the budgets, and we have the annual report, and we know the government knows the general message, it's just that it hasn't gone back and verified every word. Right. But, Your Honor, I don't think when you have somebody setting an overall message, that's sufficient to convert it into government speech. Because that's essentially saying the government can delegate this to somebody else. Say, say good things about pistachio. Now, pistachio industry, you go say whatever you want, just as long as you say some good things about pistachios. That's the CPC's position. That's not government speech. It's not the government saying, this is our speech. But do you look at that in a vacuum? In other words, you have to look at the whole statutory scheme. And you have a situation here where if the commission and its advertising is doing something untoward or not in the public interest or the language is inappropriate, then the commission can jump in, correct? And the secretary, I mean, can jump in. Well, in theory. Well, why in theory? It doesn't say that in the statute? I don't think so, but I'd like to make two points. One is, this is what I think is the Goldilocks argument. The CPC has been around 25 years. And allegedly, according to the CPC, what it's doing is being reviewed, passed on, and approved by the secretary. How is it that in 25 years, the secretary has never changed an ad, never rejected an ad, never changed a marketing plan, never rejected one? It's Goldilocks. They got it just right every time for 25 years. Well, but that's an argument that, okay, let's convert that to a legal argument that maybe is not Goldilocks. So your argument then, converting it to a legal argument, is that the absence of any intervention must mean that despite statutory authorization, that there isn't effective control. Would that be the legal argument? Yes, Your Honor. It's pro forma. It's written on a piece of paper. But why then? But if you have, maybe there was no reason to do anything. So, okay, but now you're giving a reason because you've objected to some aspects of the portrayal of Ms. Seymour and other aspects of the ad campaign, but isn't part of the system that's built into the system that you can file, well, two things. One, you can get rid of the whole thing if there's enough votes and there's this periodic referendum. That's one backup. But the other part of it is you can file a grievance and you can say, this ad copy stinks. And you should step in and do something about it because it's not effective for this market or our clients. But you've never done that. Not you, but the clients have never done that, correct? Well, our clients voted against, but they haven't filed grievances, if that's what you're talking about, Your Honor, with the Secretary. But we have no obligation to do that. That's an argument that we have to go exhaust administrative remedies or something. We object to the whole scheme. We object, or my clients object, to having to pay money to fund speech that they disagree with. And we don't like any of what they're saying. It's not that we say, ad number 13, second line, we don't like that. We don't like the way they do it. We don't like the whole scheme here. So you're disclaiming any particular challenge to what? There are particular things we dislike, too. Well, I'm asking you, one way or the other, is it, I know you don't like any of it, but are you also claiming that there are specific aspects of it that your clients object to? Sure. They sent their marketing representatives to people we sell to, Food Lion, and told them things that weren't true about pricing. We don't like the whole way they represent pricing. We don't like the whole way they represent supply. We don't like generic advertising. There are all sorts of things that we don't like. But the bottom line, then, is whether what they are doing is effectively controlled by the government. I mean, if you don't like those things, but you have, it's not really an, it's partly an exhaustion argument, but I don't think that's relevant here. The relevance seems to me to be that as part of the scheme, that there is a relationship between what the scheme is and what the government is. And what the secretary can do to take action, and the people who have to make the coerced payments. Right, but what they're saying is we're obliged to go down that road. I say we're not obliged to. We are authorized to go to federal court and challenge the whole fundamental scheme here. Let me ask you a question, a different kind of question. If, let's say we reject the argument that it's government speech, and we're talking about compelled subsidies for speech that you disagree with. Don't Abood and Keller stand for the proposition that the type of disagreement can't just be we don't like the way you're doing something. But that it has to be disagreement based on some political statement or ideological statement or something that actually is in the marketplace of ideas and has something to do with core First Amendment rights. Absolutely not. United Foods says exactly the opposite. Glickman said that. Glickman said that for Abood to apply, it must be ideological speech. United Foods says Abood applies, and it applies in United Foods to speech that is only commercial and where the only objection is by the plaintiff, we don't like generic advertising. So there's no requirement that we have some ideological objection to it. United Foods went on to say some people may find these kinds of differences and disagreements minor, but they are violations of the First Amendment. It's the difference there is in the statutory scheme itself, the collectivization and regulation of Glickman versus just the regulation of the speech. So you can see why a Lester standard might apply if you thought this was simply regulation of speech and nothing more. But United Foods is clear. An objection to commercial speech, because it's generic advertising, is a First Amendment violation. There isn't any doubt about that. There may be some doubt about some things here, but that is not a question that's at issue. The Supreme Court resolved that in United Foods. So that's if we get beyond the government speech issue. I mean, if you don't get beyond the government speech issue, then you don't go to United Foods, correct? I understand that. Okay. So let's say we disagree with the Pistachio Commission on government speech, and now we're back into the soup in terms of what is the proper analysis. If we go to United Foods and we take it at face value and say, well, the Mushroom Commission is basically like the Pistachio Commission. It's advertising. Do you still need to look at what standard to review it, and do you still need to, on a preliminary injunction, weigh the other factors beyond the likelihood of success on this legal issue? You have to weigh the other factors, but the Supreme Court and this Court have said repeatedly that a violation of First Amendment rights does establish irreparable injury. So if you agree that there's a First Amendment violation here, then we have established irreparable injury. There's nothing that the Commission offers to weigh against that constitutional violation, other than to say it would like to continue doing it. And that's not a justification for rejecting the district court's decision. Well, I guess we've been talking about United Foods and Glickman as if we were to equate the two. We've been talking about the Mushroom Commission and the Pistachio Commission. And I would appreciate your comments on this later-issued marketing order and whether we consider this interplay between the federal and state regulatory context, because that's where I think Judge Morrow kind of narrowed the issue but didn't really resolve it. Certainly, Your Honor. I think the issue here on collectivization is what is California's policy, because we are challenging California's statute and California's commission. California's policy is advertising. There's a little bit of research, but for all practical purposes, 90 percent of the money here is spent on advertising. That is California's stated position, stated by the legislature, and that's what the CPC does. And that is what the CPC has done for 25 years, without California changing the policy and saying, oh, no, we want collectivization. The California policy for 25 years has been advertising. That's what the CPC does. And the lobbying with respect to international trade barriers. Yes, there's a little bit of that. It's not a huge chunk of the money that's being spent here. Well, is it? Okay, but that raises the question as to whether the benchmark for this kind of analysis is the statutory structure or the execution of that structure. But I think it's both. First, you have to look at the structure and say, if this is the structure, is it constitutional? That is, on its face, is it constitutional? Second, you have to look and see, how is it applied in practice? What do they do? You can have all the powers in the world and never exercise them, and that's pro forma control. It's not effective control as required by Johns. Well, let's take the Internet, to play it out. You've got a minimum advertising, you've got the elimination of trade barriers, and then there's a whole bunch of other things about stabilizing product, et cetera, et cetera. It's a matter of practical sense that, you know, one lobbyist, no matter how expensive, or a handful of lobbyists, still aren't going to cost you what it is to do extensive advertising. So the fact that you spend a little bit of time and money on one aspect of your mission and a lot on the other, why does that change the constitutional analysis? Because the question we're dealing with here is the collectivization question. Has the state of California decided it wants to collectivize the pistachio industry? And all it's decided is it wants to spend almost all the money that's collected on advertising and a little bit on lobbying and a little bit on research. None of those amount to collectivization of the California pistachio industry. Let me go backwards a little bit to Johans, because this raises the same issue of structure versus application of the structure. Do you have any authority you can point us to where we would be looking at how the secretary actually implements his or her authority as a basis for determining whether or not we see if this is government speech, as opposed to simply looking at the structure, the authority, and the statutory and regulatory framework? I don't think there's anything that's squarely controlling on that. If you look at Johans itself, it talks about the difference between pro forma authority and states the test as being effective control. And then when it goes through and discusses what effective control is, it's getting down in the trenches, sending your representatives in there, working with them to get the message, to make sure it's the government that's speaking. And there, the government appointed all these people, almost all of them, and had the power to remove all of them. So the federal secretary there appointed everybody on the beef board and had the power to remove everybody on the beef board. Who has the authority to remove the people on the pistachio commission? Not the secretary here. He has no power to do that, with one exception, he can fire the president of the commission. He otherwise appoints no one except one public member out of nine, and he has no authority to remove any commissioner on the pistachio commission. Now the CPC makes a lot and says, well, he can correct, and he can tell people to cease doing something. That, we submit, is far too blunt to be workable. The secretary is going to issue a cease and desist order every time he doesn't like an ad or some of the wording in an advertising? It simply isn't workable. The CPC says, well, it's also self-enforcing. All the government has to do, the secretary there, is say, here's my order, and it's null and void. That doesn't stop the CPC from putting out an ad. If they want to stop the CPC from putting out an ad or force them to change it, they've got to go to court. They don't have that kind of power that the secretary had in Johns. They don't appoint, they don't remove, and they don't have effective control over the wording. Let me ask you, in terms of the record, you made the statement that it's been in existence for 25 years and that there's never been any kind of control, exercise, or any of these orders. Has that been developed in the record? Yes. Uncontroverted in the record that the CPC hasn't done that, and Judge Morrow found, as a matter of fact, that the CPC has never, ever changed an ad or rejected an ad. Well, what I'm a little bit uncomfortable about here is that this case comes up on a preliminary injunction, and the legal question we're asking on effective control is just how much less of what occurred in Johns could also be effective control. And so I have a little level of discomfort with deciding that when I don't know if this has, if all the relevant facts, or all the potentially relevant facts, to making a determination of what less than Johns can be effective control or have been thoroughly developed in this case when it's on a preliminary injunction posture. Certainly, Your Honor, but I would say two things to that. One is there is an extensive record here, and the kind of information we're talking about, the CPC would surely know if it had ever happened. That is, this is not where we're saying, oh, this person over here has nothing to do with it, he said this, and so that's controlling. If the CPC had a shred of evidence that any of its ads had ever been changed or rejected, perfectly able to do that, that would be a very good thing. And I think the CPC would be able to offer that up. It offered up reams and reams of information. That points up the difficulty that your argument presents. Let's say that they came in hypothetically with two examples, and they said, we don't like the tenor of the ads, so change this and this words, or change Ms. Seymour for some other celebrity who's more au courant in California right now. I mean, football players for the Super Bowl or something. Okay, now we've got, you know, two changes they've made. So now it comes to the Ninth Circuit, and we're here, and we say, oh, well, you know, they didn't like that celebrity, and they want to change a couple of words. It seems to me that the fact that they did that, you, of course, would be back here, and you would be arguing, well, the fact that they stepped in a couple of times in 25 years is kind of irrelevant. And so we're on this slippery slope of monitoring the monitor, if you will. And that, from the standpoint of trying to come to a constitutional resolution, you know, it gives me trouble. So where is it on this continuum that you would have us draw the line? Your Honor, there's no doubt, like every legal question, there's some gray areas here. But on the spectrum here, nothing. No review of anything. No rejection of anything. Sure, it's... But do you have a, have you provided, has there been a basis in the record of why things should have been rejected? Well, that's what I said is the Goldilocks argument. This is the perfect government agency. For 25 years, it never has done anything that any Secretary ever objected to. That is just wholly unreasonable and unrealistic. If what the nature of what they're doing is promoting pistachios. Now, there's probably, you know, six ways to Sunday you can do that. And you might disagree with this is too generic, and you've got these pistachios are green, and we like the ones that aren't green in the pictures. But for a Secretary to step in and say, well, I think that's the kind of thing I should get involved in and halt, the fact that he hasn't done so doesn't suggest that he doesn't have the authority to do that. I think it does, because I think it suggests that these things they talk about, like the correct and cease orders, simply aren't workable. In addition, the Secretary doesn't have the information to make these decisions. He doesn't get the ads. This is completely unlike Johns, where the representatives of the Secretary were down there in the trenches rewriting the ads with the beef board, and it's operating. It's operating under a different committee. Realize that this has to be the government saying, this is what the government says. It is not the government saying, oh, you guys go over here and do something, and, you know, kind of generally let me know what's going on occasionally, and I'll let you know if anything upsets me. It has to be the government speaking. Well, how do you respond to Mr. Waxman's argument that the level of detail that he has on ER 243, which outlines it's going to be women and heart disease and heart healthy diet and Jane Seymour's family, that that isn't sufficient to convey what left the message that the government's conveying and approving? Because it's only the overall message. It's not the advertising. They do not provide the advertising. So just to make clear then, you would have us invoke a rule that oversight over the message is not sufficient. You need to have ad by ad approval to be government speech. You have to know what the ads are. You have to have real meaningful power to control the ads, and you have to use it. That's the rule that we've argued for. That's what we think John says, because that gets back to what I think is the fundamental basis here. Is this the government speaking? This is a narrow exception to the First Amendment, because it allows the government to take a private group, compel it to pay money, to say things, and if it's going to do that, it's got to be the government speaking. And that means the government has to have effective control, has to know what's going on, it has to get in there, have the real power, as in Johan's, to get rid of people if it wants to get rid of them and really control things. If you sit on the beef board or the operating committee and you know you got appointed by the secretary and you know the secretary can remove you and you know that the secretary's representatives sit there in those meetings and work on the ads with you and tell you what they want, what do you do? You do what the secretary wants. So now, have your clients been members of this commission for the 25 years? No. Okay, well, I think in the record it said that one representative of Paramount was the head of the marketing for three years? Yes. And so there was no objection to the marketing then? There were. We voted against the plans for three years in a row. While your representative was the director of marketing? Well, he was the head of the committee. We had three representatives on the committee. The committee operated by a super majority of six votes, and our three people voted against it for at least the last three years. We lost every time. What was the message during that period of time? Was it the same heart healthy? I don't know other than what's in the record what it was back in those times. But again, your objection is, in truth, not so much to the message, but that you have to pay for any message at all, correct? Yeah, because we want to pay for our message. We don't want somebody reaching in our pocket, taking our money, and paying for a message that we disagree with. We want to take that money and pay for our message. That's what this is all about when you cut through it. It's the CPC here saying, you've got to pay. Well, the point of my question was that the district court did not enjoin the CPC from the use of the past, saying that you hadn't objected. Well, I don't think that's what she said. She noted that we voted against, but she said Mr. Frawley had signed a report on behalf of the marketing committee saying, this is a wonderful program. And she said, therefore, I'm not going to do anything about the past. We, if this goes back to the, when it goes back to the district court, and assuming that the preliminary injunction's in effect, we're going to argue and point out that, sure, Mr. Frawley said that. He was the head of the committee. The committee had a position. He couldn't individually say, I'm not going to follow what the majority of the commission or the committee has decided just because I personally disagree with it, but he voted against it. What else was he supposed to do? He has to quit and say, oh, I quit being the chairman because I disagree with what's going on.  A question was asked about whether or not there's, you know, pre-review, or pre-review of these ads is required in some form more than what we have here. If you look at the other government speech cases, Rust v. Sullivan, Santa Fe, the school prayer case, not only was there no advanced review of what the doctors in Rust were saying, or what the school chaplain in Santa Fe Independent High School were saying, they didn't even have the message. There was no review in advance, but the court, the Supreme Court found that it was government speech because the government, to quote Velasquez, had, quote, used private speakers to transmit specific information pertaining to its own programs. In terms of whether there's post hoc follow-up to see whether the ads comply with what the secretary signs off on, they have never in this case cited a specific instance in which there was inadequate follow-up, in which they didn't read the ad copy that is printed for them in the annual reports. And the notion that in 25 years the secretary has never said boo about one ad, how do you explain the fact that in all the years that Paramount and others have participated in this program, nobody has ever objected either to a specific ad or the general message, and three days after saying that there's no effective control in this case, three days after they filed their brief in this court, they filed a letter with the secretary complaining not about ads. Is this part of the record in this case? It's not a part of the record in this case. And we would not be able to consider that. In terms of whether there is oversight, in terms of the meetings that the secretary's representatives attend, Paramount put in the record in this case and actually included in its supplemental excerpts of record at page 26 of the supplemental excerpts of record a commission meeting. This is their best evidence. The commission meeting is in large part presided over by the secretary's representative. And the public member, the member that is appointed by the secretary, the minutes show, quote, and I'm quoting from the middle of page S.E.R. 26, Dr. Sursland, the public representative, stated she is an advocate of more marketing. As a raisin grower, she noted that she is not an advocate of more marketing. She experienced what could happen if one powerhouse takes over an industry. Thousands of dollars are lost, land value decreased. She shared her opinion that the pistachio industry is going down the same path by cutting programs and assessment rates while crops increase. Foundational marketing is essential, in her opinion, to allow individual processors to go out and sell product. That is the actual presentation. I have one other question that I didn't get a chance to ask earlier. There is one aspect of the argument on that this is government speech that troubled me was the fact that one of the regulations says that the state is not liable for the acts of the commission or its contracts. So, but if the state, if it was the state's speech and it was contracting to have all these ads, why should it disclaim liability? Should the state be liable? I believe this is also the case in the Beef Board and most of these other programs, but it's just, it's an expression of sovereign immunity and nothing more than that. Thank you.
judges: Hall, McKeown, Wardlaw